UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
*****

**RYAN POSTHUMUS,**

      **Plaintiff,**

v

**BOARD OF EDUCATION OF THE
MONA SHORES PUBLIC SCHOOLS,
DENNIS VANDERSTELT, JENNIFER
BUSTARD, WILLIAM TRUJILLO, and
TERRENCE BABBITT,**

      **Defendants.**
                              /

File No. 1:03CV869
Hon. Gordon J. Quist
U.S. District Judge

**Myra Dutton-Johnson (P52130)**
Attorney for Plaintiff
Post Office Box 5033
North Muskegon, MI 49445-5033
Telephone: 231-719-9164

**James S. Jamo (P36650)**
Grua, Jamo & Young, PLC
Attorneys for Defendants
                              /

**PLAINTIFF'S MOTION IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

### I.  Introduction

      Plaintiff seeks declaratory relief and compensatory damages pursuant to 42 USC §1983 for violation of his rights to substantive and procedural due process under the Fourteenth Amendment to the U.S. Constitution, when he was disciplined for words and conduct protected under the First Amendment to the U.S. Constitution.  Plaintiff also seeks a ruling that the policy under which he was disciplined is unconstitutionally vague and over broad.  Defendants have filed a motion for summary disposition arguing that they have absolute and qualified immunity.

Defendants also argue that there are no issues of material fact which could support Plaintiff's First and Fourteenth Amendment claims.

## II. Undisputed Material Facts

**A. Ryan Posthumus did not assault or intimidate a Mona Shores School Administrator.**

**1. Ryan was an honors student who had never been disciplined for any serious misbehavior.**

On May 23, 2002, Ryan Posthumus was suspended from school for the remainder of the year for allegedly "intimidating" a staff member, and for making "disrespectful and inappropriate comments to an administrator." Ex. 1, disciplinary referral. At that time, Ryan was a graduating senior and had only one day of classes and various graduation and commencement events remaining. Ryan had never been disciplined for a serious incident prior to the event on May 23, 2002. Bustard Dep., pp. 44-5. In fact, he was an honors student, one of the top ten students in his class, a three-sport athlete, who was well-liked by students and staff and had never been disciplined for anything other than tardiness or parking violations. *Id*, Exhibit 2 (teacher statements), Trujillo Dep., p. 17-18; Vanderstelt Dep., p. 19; Bustard Dep., p. 34. Ryan was not known to be aggressive or violent, but was assertive about his rights and the rights of other students. Trujillo Dep., p. 5; Babbitt Dep., pp. 28-9; Ex. 2.

**2. If Ryan had "intimidated" or "assaulted" Vanderstelt, their would have been student witnesses.**

The event upon which the suspension was based occurred at approximately 7:55 a.m. on May 23, 2002. Ex. 1. Vanderstelt testified that nearly half of the student body was present in or near the auditorium at that time, either as participants or observers. Vanderstelt Dep., p. 5. Ryan was waiting in line in the hallway outside the auditorium and holding an unopened package of

graham crackers in his hand. Vanderstelt Dep., pp. 7-8. All witnesses acknowledge that the crackers were not open at the time they were confiscated. Bustard Dep., pp. 40-1; Witness Affidavits, attached; Ex. 3, Ex. 7. Vanderstelt, came by and grabbed the crackers from Ryan's hands, without notice or explanation. *See* Witness Affidavits; Vanderstelt Dep., pp. 16-17; Exs. 3, 4 and 7.

When Ryan questioned Vanderstelt as to why he had confiscated the crackers and when they would be returned, Vanderstelt ignored him and refused to provide any explanation, instead continuing to walk away. Ex. 3; Witness Affidavits. In order to get Vanderstelt's attention, Ryan stepped in front of him and again questioned his actions. *Id*. Instead of stopping to explain the situation to Ryan, Vanderstelt rammed into Ryan, while yelling out to nearby students, "You are my witnesses, he's hindering me. Do not touch me."

Note that Vanderstelt did not yell out "stop touching me" or "he touched me" or anything else to that effect. He framed his imperative in the future tense -- do not touch me. At that point, Vanderstelt had presumably drawn the attention of everyone within at least a fifty foot radius. All witnesses testified that they heard Vanderstelt make that statement in a loud voice. Yet, with over a hundred students lined up in the hallway in the immediate vicinity of the incident, not one person saw Ryan initiate physical contact with Vanderstelt, except Bustard. And Bustard was approximately fifty feet away and Ryan had his back to her. Bustard Dep., pp. 11-12, 32.

Witnesses, Keara Cromie and Kathryn Boertman, were bronze cord students standing very close to the location where Vanderstelt initially drew attention to the matter with his remark. *See,* Student Affidavits. They testified that Ryan was not physically assaultive or aggressive and did not initiate physical contact with Vanderstelt. *Id*. In fact, both girls testified that Vanderstelt

3

seemed agitated.  *Id*.  Vanderstelt testified that he and Ryan were standing at the end of the line of students receiving silver cords and the beginning of the bronze cord line up when the alleged physical contact occurred.  Vanderstelt Dep., pp. 7-9, 13; *see*, Ex. 5.  Silver cord student, Bruce Gaultney saw Vanderstelt grab Ryan's crackers without explanation and testified that Ryan was not the aggressor in this encounter.  Witness Affidavits.  Interestingly, Bruce was eating and passing out candy while waiting in the line near Ryan.  *Id*.  Witness Callaryn Clor's testimony is consistent with that of the other students who were standing nearby.  *Id*.

Bustard received written statements from three students.  Exhibit 6.  Not one of those students saw Ryan standing in front of Vanderstelt or initiating physical contact with him.  *Id*, and Bustard Dep., p. 28.  In fact, all three stated that Ryan was *behind* Vanderstelt trying to get his crackers back.  All three of the witnesses who provided written statements believed that Ryan should not be prevented from walking at graduation because of the incident.  *Id.*  Bustard testified that she obtained those written statements from the student witnesses right after she met with Mr. Trujillo after the awards ceremony, early in the morning.  Bustard Dep., pp. 24-6, 29, 51.  She also testified that those students were standing right beside her.  *Id* at p. 26.  Why those three students were standing near Bustard in the hallway is a mystery as neither of the identified students were honors students.

Even more interesting than the fact the these witnesses who were standing right next to Bustard did not see Ryan Posthumus blocking Vanderstelt's progress or ramming into his sternum as Bustard alleged, is the fact that they all knew that Ryan was not going to get to walk at graduation because of the incident.  Ex. 6.  A decision that Bustard claims was not made until after her investigation was completed.  Bustard Dep., pp. 25-6.  Clearly Bustard, Vanderstelt and

4

Defendant Bill Trujillo met directly after the honors program and decided that Ryan would be suspended for the rest of the year, before they had talked to any witnesses, or to Ryan, about the incident.  <u>After</u> that decision was made, Bustard interviewed witnesses and obtained written statements.  Bustard Dep., pp. 23-6.

      3.    **Vanderstelt was not intimidated by Ryan Posthumus.**

Vanderstelt testified that he was not intimidated by Ryan.  Vanderstelt Dep., pp. 22-3.  He did not believe that Ryan was trying to injure him, but intended only to get Vanderstelt to stop and talk to him.  *Id* at pp. 19, 21-3.

      4.    **If Ryan had "intimidated" or "assaulted" Vanderstelt, he would have been immediately removed from school.**

Trujillo testified that none of the administrators involved in this matter ever believed that Ryan was a danger to Vanderstelt, other students in the building, or anyone else.  Trujillo Dep., p. 22.  The police were not called in and this matter was not reported to them.  *Id*.  In the past, students were most commonly asked to leave the building immediately upon intimidating or threatening a staff person.  Trujillo Dep., pp.24-5.

Ryan did not intimidate or threaten Vanderstelt.  He may have slowed him down and that irritated Vanderstelt.  Bustard testified that she did not see any part of the incident before she heard Vanderstelt tell Ryan, "you are hindering my progress, you are impeding my progress, you are my witnesses . . . ."  Bustard Dep. Pp. 11-12.  Vanderstelt testified that Ryan "knew I wanted to continue to go forward.  He would not let me."  Vanderstelt Dep., p. 14.

      5.    **Ryan Posthumus did not disrupt the educational process or pose a threat to himself or others when he questioned Vanderstelt's actions.**

Vanderstelt testified that Ryan was at his place near the front of the line by the time Vanderstelt reached that location. Vanderstelt Dep., p. 29. Bustard, Vanderstelt and Trujillo all testified that the whole incident, from start to finish, lasted no more than three minutes. Vanderstelt Dep., p 12, Bustard Dep., pp. 46-7, Trujillo Dep., p. 13.

In fact, Ryan did not assault Vanderstelt. He was punished for "impeding" Vanderstelt's progress – for getting in his way -- and for questioning the manner in which Vanderstelt confiscated his personal property. Vanderstelt testified at deposition as follows:

> Q.   Did you feel intimidated by Ryan?
>
> A.   Did I feel intimidated by Ryan? No, I didn't feel intimidated by Ryan. I felt frustrated that Ryan had no business putting his arm out and **impeding my progress** . . . at that point in time, my concern was to start that program."

Vanderstelt Dep., pp. 22-3.

Trujillo also testified that Vanderstelt's concern was to "make sure that everybody knew that he was not touching Ryan, that . . . Ryan was impeding his progress down the hall and he was trying to get the procession going in a timely manner." Trujillo Dep., p. 13. In a three page, nine paragraph letter to the Board, Babbitt gave "additional info about the Ryan Posthumus matter." Babbitt Dep., p. 28, Ex. 4. The portion of that memo that actually discussed the incident between Vanderstelt and Ryan was one half of a page – one paragraph. *Id*. In that paragraph, Babbitt explained that Ryan had a "run-in" with Vanderstelt after Vanderstelt "reached over and took crackers from Ryan and said 'not now.'" Ryan then "came around from behind and confronted Dennis about the crackers. . . . Ryan intentionally initiated physical contact

6

by bumping Dennis with his forearm." Ex. 4.

The remainder of that lengthy memo talked about the impropriety of Ryan's behavior at the honors convocation the night before the incident, and the history of problems with Cindi Posthumus. *Id*. The alleged intimidation or assault was never mentioned in that memo or in memos written the day after the incident by Trujillo (Ex. 8) and Babbitt (Ex. 9).

**B.     Ryan Posthumus' expression of his opinion to other students that Vanderstelt had not handled the confiscation of the unopened food appropriately was protected speech under the first amendment.**

When Defendant Jennifer Bustard advised Ryan to "drop it," Ryan gave up and returned to the line, referring to Vanderstelt as a "dick." *See* Student Affidavits, Ex. 6, Ex. 3. Bustard met briefly with Ryan at lunchtime to discuss the incident. During that conversation, she did not inform Ryan that charges were being made or considered, did not discuss evidence of any possible disciplinary infractions, and did not indicate that he may be suspended in connection with the incident. Bustard Dep., pp. 47-8. At approximately 2:40 p.m. that afternoon, Bustard retrieved Ryan from his last class of the day and asked him to accompany her to the principal's office where he was informed of the suspension. At no time before that point was he informed of the alleged intimidating behavior or the possibility that he would be prevented from attending the commencement exercises.

The only "offense" for which there is any evidence is the fact that Ryan told near by students that Vanderstelt was "a dick." Ryan stated his opinion in a manner that did not disrupt the educational process. He did not call Vanderstelt a name, but gave his opinion regarding Vanderstelt's confiscation of his unopened food. Ryan and his family were always open about their criticism of the administrators at Mona Shores High School, and particularly the handling of

disciplinary matters.  Trujillo Dep., pp. 20-1; Babbitt Dep., pp. 40-2, Ex. 4.

C. **Ryan Posthumus was never informed of the alleged "assaultive" or "intimidating" behavior until *after* Defendants had decided to suspend him for the remainder of the year.**

Bustard hand-delivered a letter to Ryan's mother that afternoon stating that Ryan "has been informed that if he does attempt to attend [senior events, activities, or commencement and graduation exercises] Norton Shores police would be called and he would be charged with trespassing."  Ex. 1.  However, she also testified that she and Vanderstelt wrote their statements and the letter attached to the incident report after Ryan had been informed of the suspension.

Bustard Dep., pp. 51-3.  She then states that the punishment was not decided until after Ryan left her office at the end of the day.  *Id* at p. 53.

D. **Vanderstelt, Bustard and Trujillo made the decision to suspend Ryan for the rest of the year before investigating the incident, informing Ryan of the charges against him, or giving him the opportunity to present his side of the story.**

As discussed at length above, while Bustard's testimony is so inconsistent and contradictory as to be incredible, it seems clear that Ryan was never informed of the alleged "intimidating behavior" and was never given an opportunity to answer that allegation.  Bustard and Trujillo were primarily responsible for discipline of the senior students at Mona Shores High School at the time of this incident.  Bustard Dep., p. 4; Trujillo Dep., pp. 6-7, 17.  Vanderstelt, Bustard and Trujillo met shortly after the honors ceremony was concluded on the morning of May 23, 2002, in order to discuss the incident.  Bustard Dep., p. 24; Vanderstelt Dep., p. 17-18; Trujillo Dep., p. 11.  The three claim that the actual decision to suspend Ryan for the remainder of the year was not made at that initial meeting.  Bustard Dep., p. 25.

**E.     Babbitt and the Board of Education ratified the decision.**

Plaintiff's mother, Cindi Posthumus, appealed the decision by asking Defendant Babbitt to reconsider or overturn the decision that had been made by Bustard, Vanderstelt and Trujillo. Babbitt Dep., pp. 51-2.  When Babbitt made it clear to her that he would not overturn the decision, Ms. Posthumus appealed to the Board of Education by e-mail on May 25, 2002.  Ex. 10. The Board denied the appeal and affirmed the disciplinary decision on May 27, 2002, without convening a hearing, receiving evidence or hearing argument from Plaintiff or other witnesses to the incident.  Ex. 11.  As a result of the disciplinary action against him, Ryan Posthumus was prevented from participating in a number of graduation activities and events, including commencement.

### III.  Law and Argument

**A.     Defendants are not entitled to immunity where all of the named Defendants actively participated in the violation of Ryan's clearly established constitutional rights under the First and Fourteenth Amendments to the U.S. Constitution.**

Public school defendants do not have a right to absolute immunity. *Monell v Department of Social Services,* 436 U.S. 658, 691 (1978), *Mt Healthy City Sch Dist Bd of Educ,* 429 U.S. 274, 280 (1977).  Plaintiff has not alleged any state law or tort claims in this case.

Defendants are also barred from claiming qualified immunity in this case, because they have violated Plaintiff's clearly established constitutional rights.  "Qualified immunity is an affirmative defense shielding governmental officials from liability as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Cartwright v City of Marine City,* 336 F3d 487, 490 (6th Cir. 2003).  The qualified-immunity inquiry has two principal parts. First, the court must determine "whether the

9

plaintiff has shown a violation of a constitutionally protected right." *Davis v Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998). Then, the court must discern whether the right is so "clearly established" that a "reasonable official would understand that what he is doing violates that right." *Anderson v Creighton*, 483 U.S. 635, 640 (1987)." *Cartwright, supra; see also, Buchanan v City of Bolivar,* 99 F3d 1352, 1359 (6th cir. 1996); *Megenity v Stenger*, 27 F3d 1120, 1124 (6th Cir. 1994), *Hutsell v Sayre,* 5 F3d 996, 1003 (6th Cir. 1993).

### 1. The First Amendment Right.

#### a. Plaintiff can show a violation of his First Amendment rights.

Plaintiff has clearly established that he was engaged in constitutionally protected conduct.

The First Amendment protects speech that may be "fairly characterized as constituting speech on a matter of public concern." *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 573 (6th Cir. 1997). "In order to conclude that speech addresses a matter of public concern, `this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community.'" *Id.* at 574 (citation omitted). "Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment." *Barrett*, 130 F.3d at 263. *See Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is the central meaning of the First Amendment") (quoting *New York Times* Page 974 *Co. v. Sullivan*, 376 U.S. 254, 273 (1964)). *Lucas v Monroe County,* 203 F3d 964, 973 (6th Cir. 2000).

10

### b. The First Amendment rights were clearly established.

Public school students have a clearly established right to express their opinions within the school setting pursuant to three Supreme Court decisions going back over the past thirty years. *See*, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969); *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); and, *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266 (1988).

"The standard for reviewing the suppression of vulgar or plainly offensive speech is governed by *Fraser*, *supra*. *See Chandler v. McMinnville School District*, 978 F.2d 524, 529 (9th Cir. 1992) (finding that school buttons containing inoffensive terms may not be prohibited absent a showing of a reasonable forecast of substantial disruption in school activities)." *Boroff v Van Wert City Bd of Ed*, 220 F3d 465, 469 (6th Cir, 2000). In this case, even if we assume for the sake of argument that Ryan's reference to Vanderstelt as a "dick" was vulgar or offensive, there is no showing that his language disrupted the educational process, especially where used in the hallway and only to peers nearby.

### 2. The Procedural Due Process Rights.

### a. The Fourteenth Amendment Right to procedural due process was clearly established.

Defendants acknowledge that the Plaintiff's right to procedural due process is a clearly established Constitutional right. In fact, that right has been clearly established and defined for over sixty years, as well summarized in *Goss v Lopez,* 419 US 565 (1975), where the court stated:

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures —— Boards of Education not excepted." *West*

*Virginia Board of Education* v. *Barnette,* 319 U.S. 624, 637 (1943). The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Goss v Lopez,* 419 US 565 (1975).

> **b.     Plaintiff can show a violation of his Fourteenth Amendment right to Procedural Due process.**

Under *Goss v Lopez* and its progeny, Ryan Posthumus should have been provided at least minimal procedural protections that were not provided to him.  By Defendants own testimony, as discussed at length above, it is clear that Ryan was never informed of the allegation that he had "intimidated" Vanderstelt, nor was he given an opportunity to respond to that allegation. The evidence also shows that the disciplinary decision was made <u>before</u> an investigation was even initiated.

Furthermore, Ryan's removal and deprivation was more than *de minimus* because it included not only time out of school, but the loss of a once in a lifetime opportunity – participation in his high school graduation ceremony.  In *Megenity v Stenger*, 27 F3d 1120 (6th Cir. 1994), the court acknowledged that a short-term suspension could be made more serious by loss of additional extra-curricular rights and experiences, although it wouldn't necessarily be so in every case.   The court has also determined that a suspension for the "remainder of the school term or permanently may require more formal procedures."  *Newsome v Batavia Local School District*, 842 F2d 920 (6th Cir. 1988).

12

### 3. The Substantive Due Process Right.

#### a. The Fourteenth Amendment Right to Substantive Due process was clearly established.

A reasonable person would know that you cannot enforce disciplinary policies in an arbitrary manner. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The due process clause forbids arbitrary deprivation of liberty "`[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him.'" *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975) (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)). The right to substantive due process in the public school disciplinary context was further established and discussed in the more recent case of *Seal v Morgan*, 229 F3d 567 (6th Cir. 2000), where the court held that an arbitrary deprivation of the property and liberty rights to an education and reputation can support a claim for violation of substantive due process rights. *Id*.

#### b. Defendant's decision to suspend Ryan Posthumus for the remainder of the year was not rationally related to a legitimate state interest.

In *Seal v Morgan*, 229 F3d 567 (6th Cir. 2000), plaintiff argued that the Board's ultimate decision to expel him was irrational in light of the facts uncovered by the procedures afforded him. In deciding such a case, the Court must weigh the competing interests of the parties.

> In the context of disciplining public school students, the student's interest is 'to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences.' Schools, of course, have an unquestionably powerful interest in maintaining the safety of their campuses and preserving their ability to pursue their educational mission. In exercising that power, the discipline imposed must be rationally related to a legitimate state interest. *See Vacco v. Quill,* 521 U.S. 793 (1997).

*Seal v Morgan*, 229 F3d 567, 575-76 (6th Cir. 2000).

13

The Defendant has a legitimate interest in preventing students from threatening or intimidating school administrators. Ryan Posthumus' suspension for the remainder of the school year and his exclusion from all graduation events and proceedings because of his criticism of the disciplinary tactics of Defendant Vanderstelt was not rationally related to that objective, or any other legitimate objective. As such, his exclusion from school and the attendant deprivation of liberty and property interests violated his due process rights under the fourteenth amendment to the U.S. Constitution and he is entitled to judgment on that claim as a matter of law.

**C.     Ryan was damaged by the Defendants' violation of his Constitutional rights.**

The Supreme Court has recognized the extreme importance of the once-in-a-lifetime opportunity to participate with ones peers in the high school graduation ceremony. *See, Lee v Weisman,* 505 US 577, 594-5 (1992). Ryan was an honor student who should have been graduating with his identical twin – a cause for family celebration. Instead he was protesting his suspension out in front of the building. For Ryan, graduation was one of the most important events in his life, as evidenced by his statement in the school newspaper. Ex.12. It is an event that he can never get back. As Ryan stated, he will always be known by his classmates as the kid who didn't get to graduate. Clearly he has been damaged.

### IV.  Conclusion

The evidence in this matter clearly shows that (1) Ryan Posthumus did not threaten, intimidate or assault Vanderstelt; (2) he did not disrupt the educational process or present a danger to himself or others; and (3) he was punished far more harshly than students who have engaged in such behavior in the past at Mona Shores High School.  The only unanswered question is what was Defendants' <u>real</u> motivation in suspending Ryan for the rest of the school

year.  The answer lies in the correspondence between the superintendent and the Board of Education.  The Posthumus family had been a thorn in the side of administrators at Mona Shores High School for four years, questioning disciplinary and attendance policies, educational practices, and even millage requests.  Ex. 4.  Then, on the night before this incident, Ryan did a "somersault" onto the stage when he was recognized as one of the top ten students in the class, bringing a little levity into this "somber" occasion.  *Id*.  That must have irritated Vanderstelt, who was responsible for ensuring that everything ran as planned.  It obviously bothered Babbitt enough for him to make this the first thing he mentioned to the Board of Education as "background information."

While there may remain some issues of material fact regarding the extent of the damages suffered by Ryan in being deprived of this once in a lifetime event, Plaintiff has established that Defendants acted arbitrarily, capriciously and with malice in disciplining Ryan Posthumus for the incident which occurred on May 23, 2002 and he is entitled to judgment as a matter of law.  At the very least, Defendants have failed to meet their burden to show that there are no material issues of fact to be decided at trial and their motion for summary judgment must be denied.

Respectfully submitted,

Dated: November 12, 2004

Myra Dutton-Johnson (P52130)
Attorney for Plaintiff

15